UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| TENOR D. ICKES,<br><br>        Plaintiff,<br><br>    v.<br><br>UNIVERSITY OF CALIFORNIA COLLEGE OF THE LAW, SAN FRANCISCO,<br><br>        Defendant. | Case No.  25-cv-05859-EMC<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS**<br><br>Docket No. 34 |

Plaintiff Tenor Ickes has filed suit against Defendant University of California College of the Law, San Francisco ("UC Law").  Mr. Ickes was enrolled at UC Law as a law student but was initially disqualified in the spring of 2023 and later permanently disqualified in the spring of 2025 on the basis that he did not meet certain academic requirements.  According to Mr. Ickes, he was not able to meet those requirements because, *inter alia*, UC Law failed to accommodate his disability.  Mr. Ickes claims disability on the basis that he "was diagnosed with Tourette Syndrome, chronic tic disorder, ADHD, and additional comorbidities"; as a result, he experiences "cognitive flexibility impairment, social deficits, and executive functioning challenges."  FAC ¶¶ 35, 90-91.  The accommodation that Mr. Ickes argues he should have been provided is "a flexible schedule [which would have] help[ed] [him] to succeed in law school because his Tourette Syndrome symptoms can be aggravated by rigid routines or an emphasis on quantity rather than quality of work."  FAC ¶ 23; *see also* FAC ¶ 24 (alleging that "[a] flexible schedule enables Mr. Ickes to manage his symptoms more effectively, allowing him to participate in academic activities during periods when his symptoms are less severe, and to take breaks or adjust his workload as needed").

United States District Court
Northern District of California

1    Previously, the Court denied Mr. Ickes's motion for a TRO (predicated on the original

2    complaint) and then his motion for a preliminary injunction (predicated on the operative first

3    amended complaint ("FAC")).  The denial was based, *inter alia*, on Mr. Ickes's failure to raise

4    even serious questions on the merits of his claims.  Now pending before the Court is UC Law's

5    motion to dismiss.  Having considered the parties' briefs as well as the oral argument of counsel,

6    the Court hereby **GRANTS** the motion to dismiss.

7    ### I.    FACTUAL & PROCEDURAL BACKGROUND

8    In the operative FAC, Mr. Ickes alleges as follows.

9    Mr. Ickes enrolled in UC Law in the fall of 2022.  *See* FAC ¶ 31.  In his application for

10   admission to the law school, he noted that he had been "diagnosed with childhood Tourette

11   Syndrome" but added that "the symptoms faded by adulthood."  Orig. Compl., Ex. 7 (law school

12   application)[1]; *see also* FAC ¶ 40 (alleging that, in his application, he disclosed to UC Law that his

13   "Tourette Syndrome symptoms were well-controlled").  Mr. Ickes did not mention any co-

14   morbidities related to his Tourette's, such as ADHD.

15   In May 2022, several months before he started at the university, Mr. Ickes received an

16   email from the school which included the following note:

17       **(Deadline: June 17) Accommodations due to a documented
         disability:** UC Hastings' Disability Resource Program (DRP) seeks
18       to ensure that all students are afforded equal access to educational
         opportunities.  Accommodations for students with documented
19       disabilities may be available on an individual basis subject to the
         findings and determination of the DRP Director.  Students are
20       advised to email disabilityresourceprogram@uchastings.edu by June
         17, 2022 for consideration of accommodation requests for the fall
21       semester.  More information is available on the Admitted Students
         Webpage . . . .
22
     FAC, Ex. 34 (email) (emphasis in original).
23
24   The website, in turn, stated:

25       Students can contact the Disability Resource Program via **email or
         call DRP** . . . *before or at the very beginning* of the semester to
26       initiate this process and for timely consideration of classroom-based

27   _____

28   [1] Although parts of the original complaint were filed under seal, information about and related to
     Mr. Ickes's alleged disability has been discussed at public hearings.  In addition, the FAC has been
     publicly filed in its entirety.

     2

1

> accommodations.  In order to provide accommodations that require faculty notification or special arrangements, the intake process should be completed **before the first day of class**.

FAC, Ex. 26 (emphasis in original).

Mr. Ickes did not contact DRP and ask for any accommodation for his disabilities before or during his first semester.  Implicitly, he did not do so because his symptoms were under control at that time.  *See* FAC ¶ 40 (alleging that his symptoms were well controlled at the time he applied to UC Law).

In his first semester (Fall 2022), Mr. Ickes did not have any academic difficulties.  But, in the spring semester (Spring 2023), things took a downturn.  In March 2023, a close friend passed away.  That event, along with "law school stressors," "triggered a significant resurgence of Mr. Ickes'[s] [disability-related] symptoms, substantially impairing his ability to think, learn, study and take exams in law school."  FAC ¶ 40.  Although Mr. Ickes needed an accommodation by the middle of the semester, he did not ask for an accommodation at that time.  Mr. Ickes now asserts that, because of his disability, he understood (or misunderstood) the communications from UC Law described above to mean he could ask for an accommodation *only* at the beginning of the semester.  He believed that, once the semester commenced, UC Law barred students from asking for accommodations mid-semester.  *See* FAC ¶¶ 41-42.

At the end of the spring semester, Plaintiff's GPA fell below 2.5, the minimum that law students are required to maintain to remain enrolled.  *See* FAC ¶ 43 (alleging that his GPA fell to 2.445).  As a result, he was academically disqualified.  However, UC Law had a policy that allowed disqualified students to petition for readmission.  *See* FAC ¶ 43.  The policy is codified in Academic Regulation § 1502.  Section 1502 provides as follows:

> 1502.  Readmission procedure and criteria.  A student who is excluded under §1501 may petition for readmission to the Committee on Disqualified Students. The Committee may grant the petition only if it determines that the petitioner has convincingly established that: (a) there existed **extenuating circumstances beyond the petitioner's control** (including, **but not limited to**, personal illness or death or serious illness of a friend or family member) that had a severe and adverse impact on the petitioner and that were the primary cause of the petitioner's poor academic performance; (b) the **circumstances are not likely to continue to affect the petitioner's ability to achieve** and to maintain the

United States District Court
Northern District of California

minimum cumulative grade point average or better if the petitioner is readmitted to the College; and (c) it is likely that the petitioner would be able to achieve the minimum cumulative grade point average or better at the conclusion of the student's re-enrollment in the first-year curriculum and maintain the minimum cumulative grade point average or better through graduation.

The petitioner may submit written evidence in support of the petition and upon request shall have the right to appear before the Committee. In evaluating the petition, the Committee shall consider the petitioner's Hastings file and the evidence submitted by the petitioner that is relevant to the criteria set forth above. The Committee may also request the opinions of faculty members or academic support personnel who have worked with the petitioner.

Acad. Reg. § 1502 (emphasis added).

Mr. Ickes submitted a petition for readmission. In his petition, he stated that there were extenuating circumstances because his friend had passed away. *See* Compl., Ex. 5 (petition for readmission) (stating that, "[a]s a person who completed a 10-week out-patient alcohol rehabilitation program in 2019 and who is passionate about living a substance-free life since then, hearing news about friends from the past who did not go through a substance abuse program and who have now died from substance abuse related causes is upsetting, depressing, and traumatic to me," and "[t]his tragedy was the primary case of my D in Public Health Law, resulting in a 2.45 GPA"). He did not mention his disability and the disability-related symptoms that had been triggered by the event of his friend's passing. *See* FAC ¶ 45. According to Mr. Ickes, he believed he could not claim his disability and related symptoms as an extenuating circumstance because § 1502 required that the extenuating circumstance not be "likely to continue" and his disability would never go away, but rather would always be with him. *See* FAC ¶¶ 12, 110. Thus, Mr. Ickes contends that § 1502 "coerced silence" about his disability, preventing him from asserting a disability and the need for accommodation. FAC ¶ 12.

Mr. Ickes now maintains that his understanding (or misunderstanding) of § 1502 was affected by his disability. However, in a declaration submitted in conjunction with his preliminary injunction motion, he also asserts that, before he petitioned for readmission, he talked with his family about the requirements of § 1502 and they all agreed, given its terms, he should not mention his disability. *See* Docket No. 28-1 (Ickes Decl. ¶ 34) ("We agreed that under the elements of § 1502, I would draft a petition and discuss the death of my friend."). In light of this

4

1    statement, Mr. Ickes's position would seem to be that § 1502 is confusing not only to disabled

2    persons, but also to nondisabled persons such as his family members with whom he consulted.

3    Those family members include his mother, an attorney and counselor of record herein.

4         In July 2023, a hearing was held on Mr. Ickes's petition for readmission.  *See* FAC ¶ 46.

5    Although Mr. Ickes claims he believed § 1502 prevented him from mentioning his disability, he

6    brought his disability rights advocate (his mother and counsel of record) with him to the hearing.

7    *See* FAC ¶ 47.  According to Mr. Ickes, his mother was told not to speak at the hearing.  But there

8    is no indication that Mr. Ickes told UC Law, at the hearing, that he had a disability or that his

9    mother is his disability rights advocate.  Mr. Ickes suggests that UC Law should have known he

10   suffers from Tourette Syndrome because he disclosed the disability in his law school application.

11   *See* FAC ¶ 48 (emphasizing that § 1502 requires UC Law to review a student's "Hastings file").

12   Mr. Ickes also seems to suggest that, even though he stated in his law school application that his

13   symptoms had faded by adulthood, UC Law should have, sua sponte, asked about his disability or

14   inquired into whether his academic difficulties were due to his disability.  *See* FAC ¶ 39.

15        Following the hearing, Mr. Ickes was readmitted to the law school.  But UC Law imposed

16   additional academic requirements as terms for his readmission.  Implicitly, other students were not

17   subject to these additional academic requirements because they had not previously been

18   disqualified.  But according to Mr. Ickes, UC Law should have engaged in a good faith interactive

19   process to see what the terms of readmission should have been because he is disabled.  Mr. Ickes

20   maintains that, when UC Law imposed the additional academic requirements, he was being treated

21   differently from nondisabled students, and on the basis of his disability.  *See* FAC ¶ 50.  He does

22   not claim, however, that he was treated differently from other academically disqualified students

23   seeking readmission, including those who are not disabled.

24        Among the additional academic requirements imposed were the following: (1) Plaintiff had

25   to earn a B- or better in several required bar courses and (2) he had to take a "Law and Process"

26   course each year.  The readmission terms required Plaintiff to receive a grade of "C" or above in

27   his "Law and Process" course, and a B- or better in his required bar courses, which included

28   Evidence.  *See* FAC ¶ 53; *see also* Compl., Ex. 8 (letter granting readmission but imposing certain

United States District Court
Northern District of California

conditions).

In the fall of 2023, Mr. Ickes did not ask for any accommodation for his disability at the beginning of the semester. At some point in the semester, he met with Professor Laurie Zimet for academic counseling and "expressed concern about the harmful requirements imposed upon him by UC Law, treating him differently than other students." FAC ¶ 51. But Mr. Ickes did not tell the professor about his disability or his need for an accommodation because of the disability.

In Spring 2024, Mr. Ickes again did not ask for an accommodation for his disability. Similarly, in Fall 2024 (the start of his 3L year), Mr. Ickes still did not request an accommodation.

For Spring 2025, the Dean of Students advised Mr. Ickes to take the Evidence Law and Process course as his required Law and Process class. (As indicated above, one of the additional academic requirements imposed on Mr. Ickes as a condition of readmission was that he take a Law and Process class each year.) Mr. Ickes told the Dean that he does not do well with excessive workload, but the Dean still directed that he take the class. *See* FAC ¶ 56. Mr. Ickes did not raise the issue of his disability with the Dean, nor did he ask for an accommodation. When Mr. Ickes missed the date to register for the class, the Dean still signed him up. *See* FAC ¶ 57.

During the spring semester, Mr. Ickes repeatedly told his professor, Tori Timmons, that he was struggling with the workload for the Evidence Law and Process class. *See* FAC ¶ 58. He did not mention his disability, nor did he ask for an accommodation. The professor told him to prioritize assignments with higher points/graded assignments. Mr. Ickes followed this advice, but the advice was flawed because he neglected participation assignments as a result, and this ultimately factored into his final grade and permanent disqualification from the school (discussed below). *See* FAC ¶ 59.

Subsequently, at the end of the spring semester, Mr. Ickes miscalendared the date of his final exam for the Evidence Law and Process course. According to Mr. Ickes, he failed to calendar the date correctly because of his disability. *See* FAC ¶ 61. Mr. Ickes found out about his error on the date of the exam, *see* FAC ¶ 60 (alleging that he received an email stating that the exam was taking place and that he was missing it), and arrived at the exam late. The Dean allowed him to take the exam but docked him 30 minutes. *See* FAC ¶ 61. Implicitly, the 30-

minute deduction reflected his late arrival for the exam.

At the end of Spring 2025, Mr. Ickes received a C- for the Evidence Law and Process class. *See* FAC ¶ 64. By receiving a C-, he failed to meet both the "C" or above requirement for his Law and Process course and the "B-" requirement for his required bar course.

On May 20, 2025, Mr. Ickes was permanently disqualified from UC Law. *See* FAC ¶ 64. Following his disqualification, UC Law allegedly retaliated against him. For example, on June 21, 2025, he was wrongfully locked out of his apartment building, and, on June 24, 2025, UC Law contacted him directly, rather than his lawyer, to threaten immediate collection of disputed loans. *See* FAC ¶ 68. These events occurred after Mr. Ickes sent a demand letter to UC Law in May 2025, asserting that Academic Regulation § 1502 discriminates against him. *See* FAC ¶ 66.

Based on, *inter alia*, the above allegations, Mr. Ickes asserts five causes of action based on the ADA, the Rehabilitation Act, and/or their implementing regulations. *See, e.g.*, 42 U.S.C. §§ 12132 ("[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."); 29 U.S.C. § 794 ("No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."); 28 C.F.R. § 35.160(a)(1) ("A public entity shall take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others."). While five separate claims are pled, Mr. Ickes has asserted that his rights under the statutes/regulations were violated in the following ways:

> (1) UC Law had an unreasonable policy that allowed students to request an accommodation only at the beginning of and not anytime during the semester. *See* FAC ¶ 27.

> (2) Even if UC Law did not have such a policy, UC Law did not effectively communicate to Mr. Ickes and people with disabilities such as his that he could ask for an accommodation mid-semester, leading him to believe there was no

1    such possibility.  *See* FAC ¶¶ 104, 113, 543.

2    (3)    UC Law should have started the good faith interactive process with Mr. Ickes at

3    the beginning of the year because it knew about his disability (through his law

4    school application).  *See* FAC ¶¶ 38-39.  For the same reason, it also should

5    have reached out to Mr. Ickes once he began to have academic difficulties.  *See*

6    FAC ¶¶ 48, 64.

7    (4)    Mr. Ickes's GPA fell below 2.5 (resulting in his first disqualification) because

8    his disability was never accommodated.

9    (5)    Academic Regulation § 1502, which governs petitions for readmission, is

10    confusing to people who have disabilities such as Mr. Ickes's – *i.e.*, here again,

11    UC Law failed to effectively communicate to people with disabilities such as

12    his.  *See* FAC ¶ 110.  Because the policy is confusing, Mr. Ickes believed that

13    he could not claim his disability as the extenuating circumstance for his poor

14    academic performance.  *See* FAC ¶ 110.

15    (6)    UC Law should never have imposed the additional requirements it did for

16    readmission because it did not engage in a good faith interactive process before

17    imposing the requirements.  As a result, Mr. Ickes was subject to requirements

18    that nondisabled students were not, and because of his disability.

19    (7)    Mr. Ickes did not get the required minimum grade on the Evidence Law and

20    Process course because UC Law failed to accommodate his disability and

21    instead imposed unfair requirements.

22    (8)    Mr. Ickes was permanently disqualified from the law school because UC Law

23    did not accommodate his disability.

24    (9)    UC Law retaliated against Mr. Ickes by locking him out of his apartment

25    building, and directly contacting him, rather than his lawyer, to threaten

26    immediate collection of his loans.  These events happened after Mr. Ickes's

27    May 2025 demand letter which disclosed a need for accommodation and

28    asserted that Academic Regulation § 1502 discriminates against him.  *See* FAC

¶ 66.

For purposes of the instant motion, most of Mr. Ickes's factual theories of ADA and Rehabilitation Act violations can be grouped into the following two categories:

- UC Law failed to accommodate Mr. Ickes's disabilities.
- UC Law failed to effectively communicate with persons who have disabilities such as Mr. Ickes's their rights to seek reasonable accommodations.

## II.     DISCUSSION

### A.     Legal Standard

UC Law moves to dismiss the entirety of Mr. Ickes's FAC pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* Fed. R. Civ. P. 12(b)(6). To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014). The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). But "allegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Levitt*, 765 F.3d at 1135 (quoting *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014)). "A claim has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

### B.     Failure to Accommodate

As noted above, Mr. Ickes's ADA and Rehabilitation Act claims fall into two general categories: (1) UC Law failed to accommodate his disability and (2) UC Law failed to effectively communicate certain of its policies – specifically, regarding timing of requests for accommodation

United States District Court
Northern District of California

1   and petitions for readmission.

2       Mr. Ickes's accommodation claim is brought pursuant to Title II of the ADA and Section

3   504 of the Rehabilitation Act.  Under Title II, "no qualified individual with a disability shall, by

4   reason of such disability, be excluded from participation in or be denied the benefits of the

5   services, programs, or activities of a public entity, or be subjected to discrimination by any such

6   entity."  42 U.S.C. § 12312.  Similarly, under the Rehabilitation Act, "[n]o otherwise qualified

7   individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the

8   participation in, be denied the benefits of, or be subjected to discrimination under any program or

9   activity receiving Federal financial assistance . . . ."  42 U.S.C. § 12312.  "Title II of the ADA was

10  expressly modeled after Section 504 of the Rehabilitation Act."  *Zukle v. Regents of Univ. of

11  California*, 166 F.3d 1041, 1045 (9th Cir. 1999).  "There is no significant difference in analysis of

12  the rights and obligations created by the [two statutes]."  *Id.* at 1045 n.11.

13      To make out a prima facie case under either the ADA or Rehabilitation Act, Mr. Ickes

14  must allege that (1) he is disabled; (2) he is "otherwise qualified" to remain a student at UC Law,

15  *i.e.*, he can meet the essential eligibility requirements of the school, with or without reasonable

16  accommodation; (3) he was dismissed solely because of his disability; and (4) UC Law receives

17  federal financial assistance (for the Rehabilitation Act claim), or is a public entity (for the ADA

18  claim).  *See id.* at 1045.

19      For purposes of the pending motion, the critical elements are (2) and (3).  UC Law asserts

20  that Mr. Ickes has failed to state a claim for relief because he has not sufficiently alleged the two

21  elements.  In response, Mr. Ickes's basic position is that he is "otherwise qualified" because he

22  could have met the eligibility requirements of UC Law *if* the school had accommodated his

23  disability.  *See id.* (noting that, in the school context, an otherwise qualified person is an individual

24  who meets the academic standards for admission or participation, *but* under the ADA and

25  Rehabilitation Act, a school must provide a disabled student with reasonable accommodations to

26  ensure no discrimination on the basis of disability).  For (3), he asserts that he was initially and

27  then permanently disqualified on the basis of his disability because the school knew about his

28  disability but did nothing to accommodate his disability and in fact imposed more onerous

United States District Court
Northern District of California

10

requirements on him than on nondisabled students.

The fundamental problem with Mr. Ickes's position pertains to (3): UC Law had no obligation to accommodate Mr. Ickes and avoid discrimination on the basis of his disability if (1) Mr. Ickes did not make his current disability known to U.C. Law and ask for an accommodation or (2) the school was not otherwise aware of his need for an accommodation. *See Ting v. Adams & Assocs.*, 823 Fed. Appx. 519, 523 (9th Cir. 2020) ("The district court properly dismissed Ting's claim for failure to engage in the interactive process because she failed to plausibly allege that she requested an accommodation or that Adams otherwise knew that she required one."); *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1112 (9th Cir. 2000) ("The interactive process is triggered either by a request for accommodation by a disabled employee or by the employer's recognition of the need for such an accommodation. . . . [¶] Almost all of the circuits to rule on the question have held that an employer has a mandatory obligation to engage in the interactive process and that this obligation is triggered either by the employee's request for accommodation or by the employer's recognition of the need for accommodation."), *vacated on other grounds by* 535 U.S. 391 (2002).

As to (1) Mr. Ickes never made a request for an accommodation at any point before he was permanently disqualified. He did not make a request at the beginning of his 1L year (Fall 2022), when his academic difficulties began (Spring 2023), during his readmission process (Summer 2023), at the beginning of or during the first semester after he was readmitted (Fall 2023), or at any point in the three semesters that followed (Spring 2024, Fall 2024, and Spring 2025).

Mr. Ickes suggests that his failure to make a request for accommodation is not dispositive because UC Law knew he needed an accommodation (*i.e.*, (2) above). In support, he points to his law school application where he disclosed his disability. But Mr. Ickes glosses over the fact that his application merely states that he was "diagnosed with childhood Tourette Syndrome and that "*the symptoms faded by adulthood*." Compl., Ex. 7 (law school application) (emphasis added). Thus, even if UC Law knew about the fact that he had a disability, it was ***not*** on any notice of a current disability affecting his performance at the school. Moreover, in his application, Mr. Ickes only disclosed Tourette Syndrome and not any co-morbidities, including but not limited to ADHD. If UC Law was on notice of, at most, Tourette Syndrome, it is not clear – and Mr. Ickes has not

explained – how the school should have known of possible cognitive issues.  UC Law is not a medical expert.  *Cf. Choi v. Univ. of Tex. Health Sci. Ctr. at San Antonio*, 633 Fed. Appx. 214, 216 (5th Cir. 2015) (stating that, "under the ADA 'it is important to distinguish between an employer's knowledge of an employee's disability versus an employer's knowledge of any limitations experienced by the employee as a result of that disability[;] [t]his distinction is important because the ADA requires employers to reasonably accommodate limitations, not disabilities'"); *see also Taylor v. Principal Fin. Group*, 93 F.3d 155, 165 (5th Cir. 1996) (stating that, "[w]here the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent to the employer, as is often the case when mental disabilities are involved, the initial burden rests primarily upon the employee, or his health-care provider, to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations").  Finally, even though Mr. Ickes began to have academic difficulties, he does not explain why UC Law should have known that was because of a resurgence of a childhood disability, especially a disability that did not involve any obvious cognitive learning issues such as ADHD.  *See Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 934 (7th Cir. 1995) ("The ADA does not require clairvoyance.").

Implicitly recognizing the problem with his position, Mr. Ickes presented, at the hearing on the motion to dismiss, a new theory that he has not articulated to date.  According to Mr. Ickes, UC Law should have known that he had a disability in need of accommodation because, in his petition for readmission, he stated that he was in addiction recovery, and addiction is one of the comorbidities of Tourette syndrome.  This new theory fares no better.  First, Mr. Ickes made no mention of Tourette's in his petition.  Second, while Mr. Ickes did note in his petition that he had suffered from an addiction problem, he clearly indicated that the problem was in the past.  *See* Compl., Ex. 5 (petition for readmission) (stating that he had completed an outpatient alcohol rehabilitation program in 2019 – *i.e.*, some four years earlier – and had been "living a substance-free life since then").  Finally, Mr. Ickes clearly stated in his petition that it was the death of his friend that led him to struggle academically.  *See* Compl., Ex. 5 (*See* Compl., Ex. 5 (petition for readmission) (stating that, "[a]s a person who completed a 10-week out-patient alcohol

United States District Court
Northern District of California

1   rehabilitation program in 2019 and who is passionate about living a substance-free life since then,

2   hearing news about friends from the past who did not go through a substance abuse program and

3   who have now died from substance abuse related causes is upsetting, depressing, and traumatic to

4   me," and "[t]his tragedy was the primary case of my D in Public Health Law, resulting in a 2.45

5   GPA").  Mr. Ickes also clearly stated in his petition that he was addressing the trauma he was

6   suffering as a result of his friend's death by enrolling in "weekly, recurring therapy sessions . . . to

7   learn valuable CBT skills for the future, such as dealing with anxiety over a particular issue

8   learning how to handle powerful emotions, and dealing with grief."  Compl., Ex. 5.  Thus, there is

9   nothing in the petition to support Mr. Ickes's contention that UC Law was on notice that Mr. Ickes

10  was suffering from a disability that needed accommodation.

11  C.      Effective Communication

12          Perhaps recognizing the problems with his accommodation claim, Mr. Ickes has focused in

13  his papers on his effective communication claim.  *See, e.g.*, Opp'n at 9 (contending that "UC

14  Law's arguments about Plaintiff's alleged failure to request accommodations are a diversion from

15  its own failure to communicate as required by law[;] [t]he dispositive issue is UC Law's violation

16  of its duty to provide accessible, effective communication regarding accommodations and

17  readmissions policies which constitutes discrimination under the law").

18          As indicated above, the effective communication claims are based on two factual

19  predicates.

20          •   First, Mr. Ickes asserts that UC Law's policy was to allow for a request for

21              accommodation only at the beginning of the semester – *i.e.*, not midstream.  At the

22              very least, Mr. Ickes understood (or misunderstood) this to be UC Law's policy

23              because the university's communications were not clear to people who have

24              disabilities such as his.

25          •   Second, Mr. Ickes contends that Academic Regulation § 1502 did not allow for a

26              student to raise a disability issue as part of a petition for readmission.  At the very

27              least, Mr. Ickes interpreted § 1502 as not permitting such because the regulation

28              was not clear to people who have disabilities such as his.

1    According to Mr. Ickes, UC Law's policies do not effectively communicate with people

2 who have disabilities such as his, and thus violated two regulations: 28 C.F.R. § 35.160 and §

3 42.503.  Section 35.160 (an ADA regulation) requires that public entities "take appropriate steps

4 to ensure that communications with applicants, participants, members of the public, and

5 companions with disabilities are as effective as communications with others."  28 C.F.R. §

6 35.160(a)(1).  Section 42.503 (a Rehabilitation Act regulation) contains a similar requirement for

7 recipients of federal funding, providing that"[r]ecipients shall insure that communications with

8 their applicants, employees and beneficiaries are effectively conveyed to those having impaired

9 vision and hearing."

10    1.    Scope of Regulations

11    As an initial matter, Mr. Ickes's claims fail because neither regulation is applicable.  The

12 text of § 42.503(f) clearly limits its application to individuals with "impaired sensory, manual, or

13 speaking skills."  They focus on the means of communication.  Mr. Ickes does not allege he has

14 these specific communicative impairments, but rather a cognitive one that hinges on

15 comprehension of the words communicated.  *See* FAC ¶¶ 35, 90-91.

16    As for § 35.160, Mr. Ickes relies on subsection (a)(1) which – on its face – is not

17 specifically limited to communicative limitations.  However, the Court cannot look at subsection

18 (a)(1) in isolation but rather must consider the entirety of the regulation.  The section provides:

19        (a)

20            (1)    A public entity shall take appropriate steps to ensure
                     that communications with applicants, participants,
21                   members of the public, and companions with
                     disabilities are as effective as communications with
22                   others.

23            (2)    For purposes of this section, "companion" means a
                     family member, friend, or associate of an individual
24                   seeking access to a service, program, or activity of a
                     public entity, who, along with such individual, is an
25                   appropriate person with whom the public entity
                     should communicate.
26
         (b)
27
              (1)    A public entity shall furnish appropriate auxiliary
28                   aids and services where necessary to afford

individuals with disabilities, including applicants, participants, companions, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity.

(2)    The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place. In determining what types of auxiliary aids and services are necessary, a public entity shall give primary consideration to the requests of individuals with disabilities. In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability.

(c)

(1)    A public entity shall not require an individual with a disability to bring another individual to interpret for him or her.

(2)    A public entity shall not rely on an adult accompanying an individual with a disability to interpret or facilitate communication except –

(i)    In an emergency involving an imminent threat to the safety or welfare of an individual or the public where there is no interpreter available; or

(ii)    Where the individual with a disability specifically requests that the accompanying adult interpret or facilitate communication, the accompanying adult agrees to provide such assistance, and reliance on that adult for such assistance is appropriate under the circumstances.

. . . .

(d)    Video remote interpreting (VRI) services.  A public entity that chooses to provide qualified interpreters via VRI services shall ensure that it provides [certain standards].

28 C.F.R. § 35.160.

Based on the entirety of the regulation, UC Law asserts that subsections (b), (c), and (d) implicitly limit the scope of what "effective communication" is required by (a) – *i.e.*, to providing certain "auxiliary" (*i.e.*, supplementary) tools to remove barriers to the conveyance of

United States District Court
Northern District of California

15

communications for those with sensory disabilities.  Mr. Ickes never requested any such auxiliary tools.  In other words, subsection (a)(1) sets the general goal: communications must be "as effective as" communications with others.  Section (b)(1) then specifies how to achieve that goal, *i.e.*, a public entity "shall furnish appropriate auxiliary aids and services" to remove sensory barriers to communications.  Thus, auxiliary aids and services include qualified interpreters, notetakers, written materials, assistive listening devices, and so forth.  *Cf.* 28 C.F.R. § 36.303(b) (defining "auxiliary aids and services" in regulations that address public accommodations).

UC Law's interpretation of the regulations as focusing on the means of communication for those with sensory disabilities is stronger than Mr. Ickes's which interprets the regulation as encompassing not only the means but the substantive content of communications which may affect comprehensibility for those with cognitive disabilities.  First, UC Law's interpretation is consistent with the language of the full text of the regulation as noted above.

Second, it is consistent with the guidance from the U.S. Department of Justice, which states that "[t]he purpose of the effective communication rules is to ensure that the person with a vision, hearing, or speech disability can communicate with . . . the covered entity." U.S. Dep't of Justice, Civ. Rts. Div., *ADA Requirements: Effective Communication*, ADA.gov, https://www.ada.gov/resources/effective-communication/ (last visited Dec. 26, 2025).  Thus, implicitly, DOJ contemplates that the regulation relates to auxiliary aids or services.  While such agency guidance is no longer entitled to *Chevron* deference, *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024), it remains persuasive authority as to the regulation's scope and purpose.

Third, UC Law's interpretation is consistent with case law.  Courts applying § 35.160 have done in contexts involving communication barriers due to sensory disabilities, not communication barriers related to mental or cognitive impairments. *See, e.g., K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1092 (9th Cir. 2013) (addressing provision of assistive technology for deaf or hard-of-hearing students); *Duffy v. Riveland*, 98 F.3d 447, 449 (9th Cir. 1996) (addressing the provision of assistive technology for a deaf Washington state prisoner).  Here, Mr. Ickes is not asking for an "auxiliary aid" to understand policies.  He does not cite any authority extending the

United States District Court
Northern District of California

regulation to govern the substantive content of a communication in a way that addresses the needs of a wide range of individuals with varying degrees of cognitive challenges.

Finally, UC Law's interpretation of § 35.160 is sound in light of 28 C.F.R. § 36.303, a similar regulation but one that applies to public accommodations instead of public entities. (Section 36.303 is located in Part 36, which governs public accommodations; § 35.160 is located in Part 35, which governs public entities.)  Section 36.303 provides in relevant part as follows:

> (a)  General.  A public accommodation shall take those steps that may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the public accommodation can demonstrate that taking those steps would fundamentally alter the nature of the goods, services, facilities, privileges, advantages, or accommodations being offered or would result in an undue burden, i.e., significant difficulty or expense.
>
> (b)  Examples. The term "auxiliary aids and services" includes –
>
> > (1)  Qualified interpreters on-site or through video remote interpreting (VRI) services; notetakers; real-time computer-aided transcription services; written materials; exchange of written notes; telephone handset amplifiers; assistive listening devices; assistive listening systems; telephones compatible with hearing aids; closed caption decoders; open and closed captioning, including real-time captioning; voice, text, and video-based telecommunications products and systems, including text telephones (TTYs), videophones, and captioned telephones, or equally effective telecommunications devices; videotext displays; accessible electronic and information technology; or other effective methods of making aurally delivered information available to individuals who are deaf or hard of hearing;
> >
> > (2)  Qualified readers; taped texts; audio recordings; Brailled materials and displays; screen reader software; magnification software; optical readers; secondary auditory programs (SAP); large print materials; accessible electronic and information technology; or other effective methods of making visually delivered materials available to individuals who are blind or have low vision;
> >
> > (3)  Acquisition or modification of equipment or devices; and
> >
> > (4)  Other similar services and actions.

17

1

**(c)    Effective communication.**

**(1)    A public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities. This includes an obligation to provide effective communication to companions who are individuals with disabilities.**

28 C.F.R. § 36.303 (emphasis added).  The focus again is on addressing barriers to communications with individuals who have sensory challenges.

Because the regulations on which Mr. Ickes rely are not applicable to his asserted disabilities, his effective communication claim fails.

2.    UC Law's Policies

Because the Court agrees with UC Law's interpretation, its analysis need go no further.  As noted above, Mr. Ickes has made no contention that he needed an auxiliary aid or service in order to understand UC Law's policies.  Rather, his position is that UC Law's policies as written are confusing or not understandable to people who have disabilities such as his.

But even if the Court were to adopt a broader interpretation of § 35.160, more along the lines of Mr. Ickes interpretation, he would fare no better.  The two policies Mr. Ickes challenges are not confusing on their face and Mr. Ickes has failed to explain why a person with a cognitive disability such as his could not understand the policies.

For example, Mr. Ickes asserts that he could only ask for an accommodation at the beginning of a semester because the DRP website informed students that they

> can contact the Disability Resource Program via **email or call DRP**
> . . . *before or at the very beginning* of the semester to initiate this
> process and for timely consideration of classroom-based
> accommodations.  In order to provide accommodations that require
> faculty notification or special arrangements, the intake process
> should be completed **before the first day of class**.

FAC, Ex. 26 (emphasis in original).  But the word "can" is permissive in nature; the DRP website does not use any mandatory term such as "must" or "required."  As for the term "should," it is simply exhortatory.  Nothing about the language above suggests that the *only* time a student can ask for an accommodation is before or at the beginning of the semester.  Indeed, it would defy common sense to limit a request for an accommodation to the beginning of a semester.  Under that

1    position, if a student were to break their leg in the middle of a semester, they still could not ask for

2    any accommodation. Finally, as a practical matter, it makes sense that students were given a

3    deadline so that accommodations would be ready before the semester started. That is the plain

4    purpose of the text.

5            As for Academic Regulation § 1502, Mr. Ickes argues that it compels a student to be silent

6    about any disability because it specifies that, to be readmitted, a student must show "there existed

7    extenuating circumstances beyond the petitioner's control (including, but not limited to, personal

8    illness or death or serious illness of a friend or family member)" and that those "circumstances are

9    not likely to continue to affect the petitioner's ability to achieve . . . ." Mr. Ickes maintains that,

10   because his disability is always with him – *i.e.*, it will continue – he could not mention his

11   disability. But Mr. Ickes ignores that the criteria here is that circumstances are not likely to

12   continue *to affect the ability to achieve*. Mr. Ickes has failed to explain why he could not have

13   argued to UC Law, at the time of his petition for readmission, that, if he were provided

14   accommodations, then the extenuating circumstances (the flaring up of his symptoms) would not

15   continue to affect his ability to achieve.[2]

16           Moreover, any claim by Mr. Ickes that his *disability* caused him to interpret the

17   readmission policy is severely undermined by his declaration that he submitted in conjunction

18   with his preliminary injunction motion. He states in that declaration that he traveled home to

19   discuss the situation with his parents and that, as a group, "[they] agreed that under the elements of

20   § 1502, [he] would draft a petition and discuss the death of [his] friend." Docket No. 28-1 (Ickes

21   Decl. ¶ 34). This suggests his interpretation was a reasoned, collaborative decision made with the

22   advice of his family, rather than an outcome of his cognitive disability – or at least that § 1502, if

23   unclear, is unclear to both nondisabled and disabled persons alike. Moreover, as this Court

24   previously noted, Mr. Ickes's ability to comprehend the text of the policy is informed by the fact

25   _____

26   [2] Notably, at the preliminary injunction hearing, Mr. Ickes admitted that he has received
     accommodations in the past (whether formal or informal) *which allowed him to succeed*. Further,
27   asserting his condition was temporary would have been consistent with his original application for
     admission which stated his childhood Tourette's syndrome had faded into adulthood, but then
28   flared up with the episodic crisis of his friend's death.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    that he was a *law student* who successfully gained admission into UC Law.

2    D.      Futility

3        Based on the Court's analysis above, both Mr. Ickes's accommodation and effective

4    communication claims fail as a matter of law.  The only issue remaining is whether Mr. Ickes

5    should be allowed to amend.  The Court declines to give leave to amend.

6        First, Mr. Ickes already amended his complaint once after the Court gave its views on the

7    merits of his case in conjunction with his motion for a TRO.

8        Second, Mr. Ickes has, since the adjudication of the TRO motion, adjusted his theories

9    several times in papers filed with the Court, but none of those theories is legally viable.

10       Third, to the extent Mr. Ickes suggests he could plead a viable claim by incorporating

11   allegations about the DOJ Web Accessibility Guidance (WCAG 2.1 Level AA), that guidance –

12   similar to the regulations he cited on "effective communication" – is not on point.  It addresses the

13   needs of individuals with sensory disabilities.  As noted on ADA.gov, a website maintained by

14   DOJ:

15           This rule sets a specific **technical** standard that state and local
             governments must follow to meet their existing obligations under

16           Title II of the ADA for web and mobile app accessibility.

17           WCAG, the Web Content Accessibility Guidelines, is a set of
             guidelines that say what is needed for web accessibility, **such as**

18           **requirements for captions for videos**. . . .

19   https://www.ada.gov/resources/2024-03-08-web-rule/#the-reasons-the-department-set-specific-

20   requirements-for-web-and-mobile-app-accessibility (last visited Dec. 26, 2025) (emphasis added).

21       Fourth, to the extent Mr. Ickes cites to DOJ enforcement actions, none cited by Mr. Ickes

22   suggests that a public entity or entity that receives federal funding has an obligation to make

23   content on, *e.g.*, a website clear to persons with cognitive disabilities.  For example, the DOJ

24   settlement involving Marriott involved a purported failure to provide necessary information (*i.e.*,

25   the availability of accessible rooms), which prevented guests from making reservations.  *See*

26   https://www.justice.gov/usao-co/pr/marriott-international-agrees-address-barriers-making-

27   reservations-accessible-rooms (last visited Dec. 26, 2025).  That is not the situation before the

28   Court.  Here, UC Law published the relevant policies; Mr. Ickes's claim rests on his subjective

interpretation of that information, not its absence.

Finally, although Mr. Ickes has suggested in his pleadings that UC Law retaliated against him after he sent a letter asserting that Academic Regulation § 1502 is discriminatory (*e.g.*, by locking him out of his apartment building, and directly contacting him, rather than his lawyer, to threaten immediate collection of his loans), he has never asked for leave to assert a retaliation claim against the school.  Furthermore, while there is some temporal proximity between Mr. Ickes's sending of the letter complaining about § 1502 and the latter events, the alleged causal connection is implausible given that he had already been disqualified and the school year was over – *i.e.*, his badge being deactivated and the call for payment on the loans was tied to those events and not to his letter asserting discrimination.

### III.    <u>CONCLUSION</u>

For the foregoing reasons, the Court grants UC Law's motion to dismiss with prejudice.

The Court directs the Clerk of the Court to enter a final judgment in accordance with this decision and close the file in this case.

This order disposes of Docket No. 34.

**IT IS SO ORDERED**.

Dated: December 27, 2025

_____
EDWARD M. CHEN
United States District Judge